IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARCEDALIA SALGADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07 C 5974 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| B AND B MAINTENANCE, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Darcedalia Salgado was suspended for five days and lost her day-time shift as a custodian at B and B Maintenance, Inc., after she used a client's phone for a personal call. Salgado, who was seven months' pregnant at the time, claims that B and B discriminated against her because of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. B and B has filed a motion for summary judgment. For the following reasons, the motion is GRANTED.

## I. FACTS

B and B is a janitorial and window-cleaning service that contracts with businesses in the Chicagoland area. (R.24, Facts ¶¶2, 4.) Salgado worked for B and B from April 1997 until December 2006. (*Id.* ¶1.) She started with nighttime cleaning duties at banks and a printing company until 1999, when she began receiving day-shift assignments at various Motorola offices in Illinois. (*Id.* ¶¶10-11.)

From around 2004 until her suspension in 2006, Salgado worked at Motorola's corporate headquarters in Schaumburg, dividing her shift between cleaning and working in the mailroom. (*Id.* ¶¶1, 6, 18.) Jones Lang LaSalle Americas, Inc. ("JLL") negotiated on behalf of Motorola the maintenance contract with B and B. (*Id.* ¶6.) Under the contract, JLL could demand the removal of any B and B employee "whose presence the Property Manager deems, in its sole discretion, to be detrimental to the best interests of the Property." (*Id.* ¶7.)

Victor Gallegos, B and B's district manager for Motorola's Schaumburg and Arlington Heights facilities, was charged with assigning and monitoring the work there, and B and B supervisors at those facilities would report to him. (*Id.* ¶14.) Gallegos, in turn, would report to Jim Weil, B and B's director of operations. (*Id.* ¶16.)

In May 2006, Gallegos gave Salgado a positive review and recommended her for a raise. Russ Meyer, human resources director at B and B, approved the raise, from $10 to $10.50 hourly. (*Id.* ¶20.)

By December 2006, Salgado was seven months' pregnant; it was physically obvious, and Gallegos was aware of it. (*Id.* ¶21; R.38, Add'l Facts ¶78; R.43, Resp. to Add'l Facts ¶78.) Nevertheless, Salgado had not yet requested maternity leave or made any arrangements for a leave of absence. (R.24, Facts ¶21.) This was her second pregnancy while working at B and B; when she was pregnant in 2001, she requested and received three months' maternity leave, after which she returned to work. (*Id.* ¶12.) Other B and B employees—Monica Martinez, Martha Olivera, and Anna Nava—also have taken leave and returned to work after pregnancies. (*Id.* ¶65.)

### B and B's Policy Regarding Use of Clients' Phones

According to the declarations of Gallegos, Weil, and Meyer, B and B forbids on-duty employees from using a client's phone for personal reasons without a supervisor's permission. (R.24, Facts ¶8.) But the parties dispute whether that policy was communicated or enforced.

Gallegos says he communicated the policy "several times per year" during all-employee meetings. (*Id.*) B and B has not submitted a written copy of the policy, though, and it is not included in B and B's "Employee Handbook." (R.38, Add'l Facts ¶111.) Salgado testified, moreover, that while she was aware of a prohibition on the use of personal cell-phones, she was not told, nor had she heard of others being told, that an employee could not use a client's phone for personal reasons. (R.38, Resp. to Facts ¶8, Add'l Facts 108, Exh. A. at 44-45.) Salgado says other employees—including Martin Herrera and Andy Zuk—used Motorola's phones, and that Gloria Barcenas, the employee whom Salgado replaced, told her that she could use them. (R.38, Add'l Facts ¶¶98-99, 109.) B and B responds only that there is no evidence that any supervisors or managers knew of or allowed the use of those phones for personal purposes without a supervisor's approval. (R.43, Resp. to Add'l Facts ¶¶76, 90.)

There is also no evidence that B and B ever enforced its purported policy. Juan Salgado, Salgado's husband and a former B and B supervisor, says that he was never informed of the policy. And Victor Brito-Arroyo, a former B and B employee who worked at Motorola's Schaumburg campus from 2002 to 2007, says that B and B employees, including himself, regularly would use Motorola's phones for personal reasons without asking permission, that supervisors would see the employees using the phones, and that he never heard of anyone getting in trouble for doing so. (*Id.* ¶¶76, 112-13, Exh. B. at 38-42.) Indeed, although employees have

been disciplined for using their own cell-phones, or using a cell-phone left on a client's desk, there is no evidence that B and B has ever disciplined an employee for using Motorola's (or any other client's) phones for personal reasons. (*Cf.* R.25, App'x to Facts, Tab D at ¶10, Tab F at ¶15, Tab F2; R. 24, Facts ¶9.) Because there are no public phones at Motorola's Schaumburg campus, moreover, B and B expected its employees to use Motorola's phones for work-related reasons, including responding to pages from B and B and "punching-in" at the beginning and end of a shift. (R.38, Add'l Facts ¶¶63-64, 77, 90, 94, 110.)

Salgado's Use of Motorola's Phones in November and December 2006

B and B's employees work in clients' buildings, and the clients may have their own expectations for the employees. According to Kristen Hamnik, JLL's national strategic sourcing manager, Motorola executives informed her on several occasions that they did not want contractor employees using phones at the security counter of Motorola's Schaumburg headquarters because, they said, it did not convey a professional image. Thus, Hamnik says she told B and B to inform its employees not to use those phones. (R.24, Facts ¶23.) The parties dispute whether B and B did so.

In November 2006, Hamnik observed a B and B employee using a phone at the security counter of Motorola's Schaumburg headquarters. (*Id.* ¶22.) She called Weil to tell him and to reiterate that Motorola did not want B and B personnel to use those phones. Weil responded that it would not happen again. (*Id.* ¶24.) Based on the time and location of the phone call, he determined that Salgado was the employee Hamnik had observed. (*Id.* ¶25.)

It's undisputed that Weil then called Salgado, but the parties dispute what was said, and to whom. Salgado does not speak fluent English (her first language is Spanish) so her husband,

-4-

Juan, often would translate for her. (*Id.* ¶26.) Weil says that when he called he spoke to Juan and directed him to tell Salgado not to use Motorola phones, but that if she needed to make a phone call for an emergency or to contact her manager she could use the second-floor mailroom phone. (*Id.* ¶27.) Salgado testified by deposition, however, that she, not Juan, spoke with Weil, and that Weil had asked only where she was "punching in" (a process done by phone), that she told him that she had used the security-counter phone, and that he had said that was fine and did not alert her to any problems with using Motorola's phones then or in any other conversation. (R.38, Resp. to Facts, Tab A at 47-49.) Similarly, Juan Salgado says his wife spoke to Weil during the phone call, and that he did not translate it. (R.38, Resp. to Facts ¶26.) According to Juan, after she hung up, Salgado mentioned only something about "punching-in." (R.38, Resp. to Facts, Tab D at ¶¶ 6-7.)

Whether or not Weil conveyed a warning in the call to Salgado, it's undisputed that Weil then told Hamnik that the person she had observed talking on the phone was Salgado, and that he had directed her only to use the phone in the second-floor mailroom. (R.24, Facts ¶28.)[1]

Approximately two or three weeks later, on or about December 5, 2006, an unidentified, high-level Motorola executive employee informed Hamnik that a B and B employee was talking on a phone in a Motorola conference room. According to Hamnik, the Motorola employee was displeased and requested that Hamnik remove the B and B employee from Motorola's executive

---

[1] This is one of many facts Salgado disputes in part by citing to "the entirety of the circumstantial evidence presented in Plaintiff's additional facts." Because she does not include "specific references to the affidavits, parts of the record, and other supporting materials relied upon" as the bases for her disagreement, her response violates this court's rules. *See* Local Rule 56.1(b)(3)(B). Accordingly, the court will ignore such responses and treat B and B's proffered fact as admitted unless the evidentiary basis for Salgado's disagreement is readily apparent from the record.

headquarters. (*Id.* ¶30.) Hamnik says she went to the conference room and found Salgado there talking on the phone. (*Id.* ¶31.)

Salgado admits that she was using the phone in the conference room during her shift to call her sister to arrange to pick up Salgado's children. (*Id.* ¶32; R.38, Add'l Facts ¶89.) She testified that she did not see Hamnik during her phone call, even though she was facing the door to the conference room, but she acknowledged that she could not see into the hallway without turning her head. (R.38, Resp. to Facts ¶28, Tab A at 102-06.)

On December 6, Hamnik called Weil, told him about the incident, and informed him that, because this was the second incident involving Salgado, JLL was exercising its right under their contract to require that B and B remove Salgado from her assignment at Motorola. (R.24, Facts ¶33.) Hamnik denies knowing that Salgado was pregnant at the time, and she says Salgado's pregnancy had nothing to do with JLL's demand that she be removed from her assignment at Motorola. (*Id.* ¶¶29, 36.)

Salgado's Suspension

On December 5, 2006, Weil discussed with Meyer Salgado's continued employment at B and B. (R.24, Facts ¶37.) According to Meyer and Weil, during the conversation, Weil told Meyer that Hamnik had observed Salgado using Motorola's phones on two separate occasions and that the second time was after Salgado had been directed not to do so; that Hamnik had exercised her right under the JLL contract to require B and B to remove Salgado from working at Motorola; and that Meyer would have to inform Salgado of her removal from that assignment and her suspension pending final determination of her continued employment with B and B. (*Id.*

¶40.) After the meeting, Weil asked Gallegos to tell Salgado not to report to work the next day but instead to meet with Meyer at B and B's corporate offices, and Gallegos did so. (*Id.* ¶41.)

The following day, December 6, 2006, Meyer met with Salgado (B and B's president, Silverio Osorio, translated). (*Id.* ¶42.) Salgado had not met Meyer prior to the meeting. (*Id.* ¶53.) Salgado admitted that she had used the conference-room phone to make a personal call and that she was on the phone for a short time. (*Id.* ¶45.) Meyer explained that B and B had received a complaint about the call, that Motorola had forbidden B and B employees from using their phones, and that, because Weil had specifically instructed Salgado not to do so only a few weeks earlier, Weil had decided to remove Salgado from her work assignment at Motorola and to suspend her. (*Id.* ¶¶46-48.) He asked Salgado if she would be willing to work nights (the only shifts available on non-Motorola accounts) but she responded that she could not. (*Id.* ¶49.) Meyer then explained that Salgado could appeal the decision by talking to Weil, Osorio, Bob Wirtz (B and B's owner), or Brent Wirtz (B and B's assistant operations director). Salgado did not exercise those appeal rights. (*Id.* ¶51.)

After the meeting on December 6, Meyer and Weil exchanged e-mails. Meyer had not been aware of Salgado's pregnancy until meeting with her, and he mentioned it in an e-mail to Weil. (*Id.* ¶¶54-55.) Weil told Meyer that he considered Salgado's behavior to be stealing from the company. (*Id.* ¶55.) According to Weil, during his tenure with B and B, other than the Salgado phone incident, he has never received any complaints from clients about a B and B employee using a client's phone for personal reasons during work time. (*Id.* ¶69.) He decided that, in addition to removing Salgado from her Motorola assignment, he would suspend her for five days. (*Id.* ¶56.) Weil says he did so because Salgado's actions had cast B and B in a

negative light with JLL and because she had committed a second infraction shortly after being warned. (*Id.* ¶39.) (Again, Salgado disputes that she ever was warned.)

Although Salgado was not fired, there were no non-Motorola dayshift positions available during December 2006, and so Salgado did not return to work at that time. (Weil acknowledges that he was aware of that potential consequence when he suspended her.) (*Id.* ¶¶56-57.) Nevertheless, Meyer continued to search for open non-Motorola dayshift positions for Salgado and, on or about July 13 or 15, 2007, he called Salgado to offer her a new dayshift cleaning position at Holy Family Medical Center in Des Plaines, Illinois, at $10.50 per hour. (*Id.* ¶¶57-59.) Meyer sent her an offer letter on July 16, but Salgado rejected the offer because she could not commute to Des Plaines. (*Id.* ¶¶59-60.)

According to Weil's declaration, Salgado's pregnancy had nothing to do with his decision to suspend her and remove her from her work assignment at Motorola. (R.24, Facts ¶70.) Furthermore, he says he did not know that Salgado was pregnant until December 6, 2006, when Meyer told him. (*Id.* ¶29.) Salgado disputes that fact, but she relies only on Juan Salgado's declaration that in 2006 Weil had asked about Salgado's pregnancy, and whether they were expecting a girl or a boy, on several occasions. (R.38, Resp. to Facts ¶29.) Weil responds that, if he spoke with Juan about Salgado's pregnancy, it occurred after December 6, 2006. (R.44-2, Weil Supp. Dec. ¶¶2-4.)

<u>Gallegos's Involvement in Salgado's Suspension</u>

Salgado thinks that JLL was never involved and that her suspension—a de facto termination—was Gallegos's response to her pregnancy. (R.38, Resp. to Facts ¶52.) B and B does not dispute that Gallegos knew that Salgado was pregnant, but it responds that Gallegos

-8-

(1) did not have authority to suspend her without Weil's approval and (2) was not involved, in any event. With respect to the first point, Salgado notes that her husband, Juan, a former B and B supervisor, swore in his declaration that from June 2003 to June 2004 he had observed Gallegos fire at least six employees "on the spot" after a customer complained. (R.32, Resp. to Facts, Tab D ¶4; R.38, Add'l Facts ¶103.) But according to the declarations of Gallegos, Meyer, and Weil, Gallegos did not have authority to hire or fire employees without first receiving approval. They say any decisions communicated by Gallegos must have been approved by higher-level management. (R.24, Facts ¶15; R.43, Resp. to Add'l Facts ¶103.)

Whether or not Gallegos could have disciplined Salgado, though, there is virtually no evidence that he did. Salgado offers only her testimony that, during her December 6 conversation with Meyer, he told her that Gallegos did not want her working for him. (R.38, Exh. A at 96-97.) (B and B disputes that fact but offers no evidence to contradict it. (R.43, Resp. to Add'l Facts ¶95.)) Other than that, she rests entirely on her own belief (without personal knowledge) that Gallegos was the source of the complaint about her use of Motorola's phone in December 2006. (R.24, Facts ¶73.) But Hamnik says that a Motorola employee complained, not Gallegos, and according to the declarations of Gallegos, Meyer, and Weil, Gallegos was not involved in the decision to suspend Salgado, nor with her removal from the Motorola assignment. (*Id.* ¶52.)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of

law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in her pleadings or conclusory statements in affidavits; she must support her contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination "because of" sex includes discrimination based on pregnancy. *Id.* § 2000e(k); *Hall v. Nalco*, 534 F.3d 644, 645 (7th Cir. 2008). To prove pregnancy discrimination, Salgado may use the direct or indirect methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or she can combine both approaches. *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007).

Proof under the direct method includes "either an acknowledgement of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). Circumstantial evidence may include: (1) suspicious timing, ambiguous statements, a pattern of behavior toward pregnant women, or any other evidence from which a jury could infer discrimination; (2) evidence of comparatively different treatment toward non-pregnant employees; and (3) evidence that she suffered an adverse action despite being qualified, along with a showing that the proffered reason for the action is not believable. *Phelan v. Cook County*, 463 F.3d 773, 781 (7th Cir. 2006); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). A prima facie case of discrimination under the indirect method would involve showing that (1) she suffered an adverse employment action; (2) she was pregnant and her employer knew she was pregnant; (3) she was performing her duties satisfactorily; and (4) B and B treated similarly situated employees who were not pregnant more favorably. *See Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007).

Salgado proceeds only under the direct method, highlighting circumstantial evidence that, she argues, could support a jury's finding of discrimination. Specifically, she points to genuine issues of fact regarding: (1) whether Weil knew she was pregnant; (2) whether B and B has a policy against the use of clients' phones for personal use, and whether it was communicated or enforced; and (3) whether Gallegos played a role in Salgado's removal or suspension. She also argues that the suspicious timing of the decision (i.e., when she was 7 months' pregnant) could support a jury's conclusion that B and B's proffered rationales for removing Salgado from the Motorola assignment and suspending her were pretextual. (Salgado Resp. Br. 14-15.)

Although Salgado has identified some disputed facts, she has not put forth a "convincing mosaic of circumstantial evidence" that would support a jury's finding of pregnancy discrimination. *See Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotation marks omitted). Specifically, Salgado has offered no evidence that her removal from the Motorola assignment was B and B's decision, rather than JLL's. She does not dispute that JLL had the right to demand her removal, and she has offered no evidence to contradict Hamnik's account—including Hamnik's sworn declaration that she was unaware that Salgado was pregnant. Salgado simply insists that Gallegos was involved, but her only evidence of that is her testimony that Meyer told her that Gallegos did not want her working there. But a jury could not conclude that Gallegos was involved in JLL's and B and B's response to the phone incident, nor that he was motivated by Salgado's pregnancy, based on that vague statement. Rather, Meyer, Weil, and Hamnik consistently swore in their declarations that JLL removed Salgado from her position at the request of a Motorola employee, not Gallegos, and Salgado's speculation to the contrary is insufficient to create an issue of fact. *See James v. Sheahan*, 137 F.3d 1003, 1006 (7th Cir. 1998).

That being said, viewing the facts in the light most favorable to Salgado, her removal could be considered a harsh and somewhat unfair punishment, particularly if, as she testified, she was never informed of B and B's policy about the use of phones (let alone JLL/Motorola's policy). And, potentially, B and B could be considered responsible for JLL's decision because it failed to advocate on Salgado's behalf to prevent her removal. But it would be difficult to review that decision without acting as a "super-personnel department," a role this court will not play. *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008). And, in any event, Salgado has

offered no basis to conclude that B and B would have advocated on behalf of a non-pregnant employee under similar circumstances. According to Weil's undisputed declaration, he had never before received complaints about an employee's use of a client's phone. Nor is there any evidence that B and B has ever contested a client's demand that an employee be removed from a work site. And without evidence that *Salgado* advocated on her own behalf—by, for example, exercising her appeal rights and clarifying her understanding of the phone policy to Meyer, Weil, Osorio, or the Wirtzes—there is no basis to conclude that, if Salgado was not in fact warned about using client's phones, B and B was aware of it. Accordingly, there is no evidence upon which a jury could conclude that she was removed from the Motorola assignment because of her pregnancy.

The court must also consider the second adverse action: Salgado's five-day suspension. But it's unclear that Salgado suffered any tangible consequence from that action; it's undisputed that there were no non-Motorola dayshifts available at the time, and thus there's no evidence that she would have been able to work even if she had not been suspended. And if she suffered no material change in the conditions of her employment—like termination, demotion, financial consequences, or a change in her responsibilities—her suspension cannot be considered an adverse action under Title VII. *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008). Nevertheless, for the sake of completeness, the court will consider whether there is evidence that Salgado's pregnancy motivated Weil's decision to suspend her.

Weil has offered two legitimate, non-discriminatory reasons for suspending Salgado: (1) she had cast B and B in a negative light with JLL; and (2) she had not heeded his prior warning. The first reason is undisputed (again, whether JLL's reaction was unfair is not for the

-13-

court to decide). And though the parties dispute the factual predicate of the second reason—i.e., whether Salgado was warned—there is no evidence that Weil did not believe in good faith that Salgado had been warned. A pretextual rationale is more than simply "faulty reasoning or mistaken judgment." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "An employer's explanation can be foolish or trivial or even baseless so long as it honestly believed the proffered reasons for the adverse employment action." *Id.* (internal quotation marks and citation omitted). Here, Salgado offers no evidence upon which a jury could find that Weil's reasons are pretextual. She points only to the "suspicious timing" of Weil's decision to suspend her. But timing alone is not enough to show pretext—particularly when, as here, the employer's explanation is consistent with the timing of the decision. *See Filar v. Bd. of Educ.*, 526 F.3d 1054, 1064-65 (7th Cir. 2008). Ultimately, there is insufficient evidence to conclude that Weil's decision to suspend Salgado for five days—an inconsequential choice, it would seem, compared to her removal from the Motorola account—was motivated in any way by her pregnancy.

## IV. CONCLUSION

Because Salgado has not presented sufficient evidence upon which a jury could conclude that B and B discriminated against her because she was pregnant, the court **GRANTS** B and B's motion for summary judgment.

**Enter:**

/s/ David H. Coar

_____

David H. Coar

United States District Judge

Dated: **January 5, 2009**

-14-